[970 NE2d 833, 947 NYS2d 798]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMES D. KENT, Appellant.

Argued March 20, 2012; decided May 8, 2012

## POINTS OF COUNSEL

*Diarchies, Eiger & Abelson, P.C.,* New York City (*Nathan Z. Diarchies* and *Victoria B. Eiger* of counsel), for appellant. I. James Kent's conviction on count 1—promoting a sexual performance by a child (procurement) of the cached "School Backyard" Web page—must be set aside. (*People v Keyes,* 75 NY2d 343; *Stanley v Georgia,* 394 US 557; *Osborne v Ohio,* 495 US 103; *People v Ribowsky,* 77 NY2d 284; *People v Spann,* 56 NY2d 469; *People v Roberts,* 135 AD2d 1026; *People v Charles,* 61 NY2d 321; *Matter of Corbin v Hillery,* 74 NY2d 279, *affd sub nom. Grady v Corbin,* 495 US 508; *United States v Dixon,* 509 US 688; *People v Rubin,* 101 AD2d 71.) II. James Kent's conviction for procurement of the Arina video is also invalid: neither the prosecution's theory as charged in the indictment, or as amended at the end of the trial, constitutes procurement (promotion). (*People v LaPetina,* 34 AD3d 836, 9 NY3d 854;

*People v Perez*, 83 NY2d 269; *People v Chicas*, 204 AD2d 476; *People v Brown*, 221 AD2d 353; *People v Taplin*, 1 AD3d 1044; *People v Thompson*, 217 AD2d 929; *People v O'Connor*, 240 AD2d 764; *People v Bell*, 206 AD2d 686; *People v Rogers*, 141 AD2d 870; *People v Pike*, 254 AD2d 727.) III. James Kent's possessing a sexual performance by a child convictions are also invalid. (*People v Fraser*, 96 NY2d 318, 533 US 951; *Holcomb v Harris*, 166 NY 257; *CMI Capital Mkt. Inv., LLC v Municipality of Bayamon*, 410 F Supp 2d 61; *People v Zagorsky*, 73 Misc 2d 420; *People v Melhado*, 53 NY2d 984; *People v Williams*, 43 NY2d 725; *New York v Ferber*, 458 US 747.) IV. James Kent's claim of ineffective assistance of counsel based on failure to challenge the warrantless search of Kent's hard drive was ripe for consideration on appeal; the search was illegal as a matter of constitutional law. (*People v Mobley*, 59 AD3d 741; *People v Donovan*, 184 AD2d 654; *People v Rivera*, 71 NY2d 705; *People v Park*, 60 AD3d 972; *People v Sinatra*, 89 AD2d 913; *People v Marcial*, 41 AD3d 1308; *People v Cyrus*, 48 AD3d 150; *People v Belton*, 55 NY2d 49; *People v Torres*, 74 NY2d 224; *People v Weaver*, 12 NY3d 433.)

*William V. Grady, District Attorney*, Poughkeepsie (*Bridget Rahilly Steller* of counsel), for respondent. I. Defendant's guilt of promoting a sexual performance by a child relating to the "School Backyard" Web page was established beyond a reasonable doubt. (*People v Keyes*, 75 NY2d 343; *People v Fraser*, 264 AD2d 105, 96 NY2d 318, 533 US 951; *People v Greenberg*, 89 NY2d 553; *People v Thomas*, 273 AD2d 490, 95 NY2d 970; *People v Lovacco*, 147 AD2d 592, 74 NY2d 743; *People v Iannone*, 45 NY2d 589; *People v D'Angelo*, 98 NY2d 733; *People v Davis*, 41 NY2d 678; *People v Kolupa*, 13 NY3d 786; *People v Hines*, 97 NY2d 56.) II. Defendant's guilt of promoting a sexual performance by a child relating to the Arina video was established beyond a reasonable doubt. (*People v Beasley*, 16 NY3d 289; *People v Hawkins*, 11 NY3d 484; *People v D'Angelo*, 98 NY2d 733; *People v Iannone*, 45 NY2d 589; *People v Cunningham*, 48 NY2d 938; *People v Jackson*, 111 NY 362; *People v O'Connor*, 240 AD2d 764; *People v LaPetina*, 34 AD3d 836; *People v Straniero*, 17 AD3d 161, 5 NY3d 795; *People v Robinson*, 119 AD2d 598, 68 NY2d 816.) III. Defendant's guilt of the 134 counts of possessing a sexual performance by a child was established beyond a reasonable doubt. (*People v Beasley*, 16 NY3d 289; *People v Hawkins*, 11 NY3d 484; *People v Cona*, 49 NY2d 26; *People v Fraser*, 96 NY2d 318; *People v Keyes*, 75 NY2d 343; *New York v*

*Ferber*, 458 US 747; *People v Malizia*, 62 NY2d 755.) IV. Defendant received the effective assistance of trial counsel. (*People v Benevento*, 91 NY2d 708; *People v Rivera*, 71 NY2d 705; *People v Ramirez-Portoreal*, 88 NY2d 99; *People v Denny*, 95 NY2d 921; *People v Love*, 57 NY2d 998.)

## OPINION OF THE COURT

CIPARICK, J.

The question presented for our review is whether the evidence proffered at defendant's trial was legally sufficient to support his convictions for promoting a sexual performance by a child (Penal Law § 263.15) and possessing a sexual performance by a child (Penal Law § 263.16). We must consider, among other issues, the evidentiary significance of "cache files," or temporary Internet files automatically created and stored on a defendant's hard drive, and the defendant's awareness of the presence of such files. We conclude that where the evidence fails to show that defendant had such awareness, the People have not met their burden of demonstrating defendant's knowing procurement or possession of those files. We further conclude that merely viewing Web images of child pornography does not, absent other proof, constitute either possession or procurement within the meaning of our Penal Law.

## I.

The following evidence was adduced at defendant's trial. On May 26, 2005, defendant James D. Kent, a professor of public administration at a Dutchess County college, received a new office computer through a campus-wide technology upgrade. The files stored on the hard drive of the old computer were transferred to the new computer. On April 5, 2007, a student employee of the college's information technology (IT) department went to defendant's office in response to his complaints that his computer was malfunctioning. While running a virus scan of the computer's hard drive, the employee discovered a work folder containing numerous ".jpg" or picture files, displayed as "thumbnails," of scantily clad, prepubescent girls in provocative poses. When the virus scan failed to correct the computer's unresponsiveness, the employee removed defendant's hard drive and took it back to the IT office, where supervisors learned of the images. College administrators informed defendant that these images had been found on his computer, but defendant denied any knowledge of them. Approximately two

weeks later, the college submitted defendant's hard drive to the Town of Poughkeepsie Police Department with a "Consent to Search" form signed by a college administrator.

Barry Friedman, an investigator in the computer forensic lab of the New York State Police, conducted a forensic analysis of defendant's hard drive using EnCase Software (EnCase). Investigator Friedman explained that EnCase searches both allocated space, which contains data (including saved items or items sent to the "recycle bin") that is readily accessible to a user, and unallocated space, which contains material deleted from the allocated space and is inaccessible to a user. Defendant's computer contained Real Player, a downloadable media program used to play videos and music that maintains a "play" history. The computer also had two Internet browsers: Internet Explorer and Mozilla Firefox. In addition to the default profile provided by Mozilla Firefox, a second profile under the name of "Jim" had been created.

The allocated space under the Jim profile on Mozilla Firefox contained a temporary Internet file known as a Web "cache." A cache contains images or portions of a Web page that are automatically stored when that page is visited and displayed on the computer screen; if the user visits the Web page again at a later date, the images are recalled from the cache rather than being pulled from the Internet, allowing the page to load more quickly. The cache under the Jim profile contained a .jpg image of a child pornography Web site called "School Backyard" that depicted children engaged in sexual intercourse with adults.

According to the EnCase software, the "School Backyard" page had been accessed on the morning of February 21, 2007. Within minutes of accessing "School Backyard," three other pages were accessed—two images of a young girl sitting in the front seat of her car with her wrists bound and a Web page labeled "Pedoland"—which were also stored in the Web cache. The cache contained several other Web pages labeled, among other things, "Best CP Sites Portal, the Best Lolita CP Sites," that provided links to child pornography Web sites. Additionally, the Real Player history included links to numerous videos with file names indicating that they contained child pornography that were accessed, some on multiple occasions, between 2005 and 2007. There was no evidence that defendant was aware either of the cache function of his computer or that any of these files were stored in the cache.

The allocated space on defendant's hard drive also contained a "My Documents" folder with subfolders labeled "cdocs" and another labeled "work," and an additional folder labeled "JK." The "cdocs" subfolder contained approximately 13,000 saved images of female children, whom Investigator Friedman estimated to be eight or nine years old, dressed in lingerie or bathing suits and many with their legs spread open. The "work" subfolder contained an additional 17,000 saved images of female children, some organized into further subfolders named for a particular child. The JK folder held a file labeled "porndef.pb," which contained a document that included the text of four messages dated between June 1999 and July 2000 and directed to the unidentified recipient "P.B."[1] The messages apparently relate to a potential research project on the regulation of child pornography and include comments such as "sooner or later someone at this college is going to wonder why I keep looking at porno sites." A final message dated July 11, 2001 states:

> "Well, this last batch pretty much tears it. While, as somebody's father, I'm pretty appalled by this stuff, I also don't want to get arrested for having it. So let's do this—if this is a legitimate research project, let's write it up and tell the deans (and preferably also the cops) what we're doing and why. Otherwise, let's drop it in the most pronto possible fashion.

> "I don't even think I can mail the disk to you, or anyone else, without committing a separate crime. So I'll probably just go ahead and wipe them. You have the URLs if you want to pursue it.

> "See you sooner or later, no doubt. Kent."

From the unallocated space on the computer, EnCase retrieved a video containing child pornography that had previously been downloaded and saved to the allocated space under the file name "Arina." EnCase also discovered over 130 .jpg images depicting children engaged in oral sex and sexual intercourse with dogs, adults and other children, children being penetrated by objects, and the lewd exhibition of the exposed genitals of female children. Like the "Arina" video, each of these images had been downloaded and stored in the allocated space of defendant's computer at some point between May 26, 2005 (the date that

---

1. As the Appellate Division noted, it is unclear whether these messages were ever sent.

data was transferred from defendant's old computer to his new computer) and April 5, 2007 (the date the IT employee removed the hard drive) before the user deleted them, sending them to unallocated space. There was no evidence that defendant ever paid for access to any of the child pornography found on his computer.

Defendant was indicted on two counts of promoting a sexual performance by a child (Penal Law § 263.15) and 141 counts of possessing a sexual performance by a child (Penal Law § 263.16). Counts 1 and 142 related, respectively, to defendant's alleged procurement and possession of the "School Backyard" Web page; counts 2 and 143 related, respectively, to defendant's alleged procurement and possession of the "Arina" video; counts 3 through 141 charged defendant with possession of the .jpg images recovered from the unallocated space of the hard drive. During defendant's six-day nonjury trial, County Court denied defendant's trial motions for dismissal of the indictment. At the close of the trial, County Court granted the People's motion to conform the pleadings to the proof by amending count 2 of the indictment to reflect May 18, 2005 as the date of the alleged procurement of the "Arina" video. Thereafter, County Court found defendant guilty of both procurement counts (1 and 2) and 134 of the 141 possession counts, including counts 142 and 143.[2] County Court subsequently denied defendant's motion to set aside the verdict, finding that the evidence was legally sufficient to sustain his convictions (see CPL 330.30 [1]). Defendant was sentenced to concurrent indeterminate prison terms of 1 to 3 years.

The Appellate Division affirmed County Court's judgment (see People v Kent, 79 AD3d 52, 73 [2d Dept 2010]). Addressing the evidentiary significance of the presence of Internet files stored in a cache, as well as the significance of defendant's knowledge or lack of knowledge regarding the cache function of his computer, the court undertook a review of both federal and state approaches to these issues (see id. at 65-66). Noting that "[t]he consistent thread in these cases is the need to distinguish inadvertent or unintentional acquisition or possession of the offensive material from knowing or intentional procurement and possession," the court stated its preliminary "agreement with the underlying premise that the mere existence of an image

___

2. County Court found defendant not guilty of counts 24, 28, 49, 97, 101, 102 and 140.

automatically stored in the cache, standing alone, is legally insufficient to prove either knowing procurement or knowing possession of child pornography" (*id.* at 66).

The court adopted the view, however, that "a Web page stored in the cache is evidence of past procurement of the images on that page. Specifically, the cached Web page from the 'School Backyard' site is evidence that the Web page was accessed and displayed on the defendant's computer screen" (*id.* at 67). That defendant knowingly accessed the page was demonstrated by a totality of evidence including defendant's pattern of Internet browsing for child pornography Web sites, his Real Player history, and his messages to "P.B." acknowledging his possession of child pornography (*id.* at 67-68). The court further held that the evidence was legally sufficient to prove defendant's knowing possession of the images on the "School Backyard" page, finding that defendant "knowingly accessed the Web page and displayed it on his computer screen . . . establishing his dominion and control over the images" (*id.* at 68).

The court also found that the evidence was legally sufficient to support defendant's 134 other convictions, because those counts were based on "images which, at one time, had been downloaded and saved in the allocated space of the hard drive and subsequently deleted" (*id.* at 68-69). With respect to count 2, for promotion of the "Arina" video, the court found that "the totality of the direct and circumstantial evidence of . . . defendant's extensive use of his office computer to obtain and view child pornography was a sufficient basis from which the fact-finder could infer that [he] acquired the video, and thus, committed an act of procurement" (*id.* at 70).

A Judge of this Court granted defendant leave to appeal (17 NY3d 797 [2011]) and we now modify by reversing defendant's convictions on counts 1 and 142 for promotion and possession of the "School Backyard" Web page and, as so modified, affirm.

## II.

Recognizing that "[t]he public policy of the state demands the protection of children from exploitation through sexual performances" (L 1977, ch 910, § 1), the Legislature enacted article 263 of the Penal Law "to eradicate the social evil of child pornography" (*People v Keyes*, 75 NY2d 343, 348 [1990]). With limited exception (*see People v Fraser*, 96 NY2d 318 [2001]), we have not had occasion to determine the extent to which the current statutory scheme applies to child pornography distributed

and consumed over the Internet, a forum unknown to legislative drafters 30 years ago and which now provides a readily accessible and expansive marketplace for illicit material. Indeed, the Internet now allows for "a diverse array of offenders who can access and circulate images easily and privately from home computers" (*see* Wolak, Finkelhor, Mitchell and Ybarra, *Online "Predators" and Their Victims: Myths, Realities, and Implications for Prevention and Treatment*, 63 Am Psychologist 111, 120 [Feb.-Mar. 2008]). The resulting danger to the safety and welfare of children cannot be overstated: in a study of persons prosecuted for Internet-related child pornography crimes, 80% had images showing the sexual penetration of a child and nearly 20% had images of children younger than age three (*see* Wolak, Finkelhor and Mitchell, Child-Pornography Possessors Arrested in Internet-Related Crimes: Findings from the National Juvenile Online Victimization Study, at 5 [2005]).

Penal Law § 263.15 provides that "[a] person is guilty of promoting a sexual performance by a child when, knowing the character and content thereof, he produces, directs or promotes any performance which includes sexual conduct by a child less than seventeen years of age." To "promote" means, among other things, "to procure" (Penal Law § 263.00 [5]),[3] itself defined as "obtain, acquire . . . to get possession of by particular care or effort" (*Keyes*, 75 NY2d at 348 [internal quotation marks omitted]). Thus, "the term 'procure' . . . defines 'promote' for the purposes of Penal Law § 263.15 as simply the acquisition of child pornography, whether for personal consumption or for distribution to others" (*id.*). Penal Law § 263.16 provides that "[a] person is guilty of possessing a sexual performance by a child when, knowing the character and content thereof, he knowingly has in his possession or control any performance which includes sexual conduct by a child less than sixteen years of age."

For purposes of both the promotion and possession statutes, "performance" is defined as "any play, motion picture, photograph or dance" (Penal Law § 263.00 [4]). We have held that digital computer images are photographs within the meaning of section 263.00 (4) (*see Fraser*, 96 NY2d at 327-328). "Sexual conduct," as used in both statutes, "means actual or

---

**3.** "Promote" is additionally defined in that section as to "manufacture, issue, sell, give, provide, lend, mail, deliver, transfer, transmute, publish, distribute, circulate, disseminate, present, exhibit or advertise, or to offer or agree to do the same" (Penal Law § 263.00 [5]).

simulated sexual intercourse, oral sexual conduct, anal sexual conduct, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals" (Penal Law § 263.00 [3]). Furthermore, both crimes require that the defendant acted knowingly (*see* Penal Law § 15.05 [2]). The exercise of "[d]ominion or control is necessarily knowing, and such 'constructive possession' may qualify as knowing possession" (*People v Muhammad*, 16 NY3d 184, 188 [2011]).

Defendant argues that merely "accessing and displaying" Web images of child pornography does not constitute procurement for purposes of Penal Law § 263.15. Defendant further contends that his possession convictions are invalid because Penal Law § 263.16 criminalizes the possession of tangible items only and that, absent proof that defendant was aware of his computer's cache function, he could not have knowingly possessed any item stored in the cache. For the reasons that follow, we agree with defendant's first proposition. We also agree that where a promotion or possession conviction is premised on cached images or files as contraband, the People must prove, at a minimum, that the defendant was aware of the presence of those items in the cache. We hold, however, that regardless of a defendant's awareness of his computer's cache function, the files stored in the cache may constitute evidence of images that were previously viewed; to possess those images, however, the defendant's conduct must exceed mere viewing to encompass more affirmative acts of control such as printing, downloading or saving.

Federal courts have held that for digital images to constitute evidence of knowing possession of child pornography, such images must be connected to something tangible (e.g., the hard drive), as they are when stored in a cache, and that the defendant must be aware of that connection (*see United States v Romm*, 455 F3d 990, 1000 [9th Cir 2006] ["to possess the images in the cache, the defendant must, at a minimum, know that the unlawful images are stored on a disk or other tangible material in his possession"]; *United States v Tucker*, 305 F3d 1193, 1205 [10th Cir 2002] ["Since (the defendant) knew his browser cached the image files, each time he intentionally sought out and viewed child pornography with his Web browser he knowingly acquired and possessed the images"]). At least two state courts have adopted the federal approach (*see Worden v State*, 213 P3d 144, 147-149 [Alaska 2009]; *Barton v State*, 286 Ga App 49, 52-53, 648 SE2d 660, 663 [2007]).

The rule espoused by several other states and by the Appellate Division—that defendant's awareness of the automatic cache function is immaterial because it is not the cached files that constitute the contraband but the images previously displayed—is conceptually distinct as it does not rely on the tangibility of the image (i.e., its permanent placement on the defendant's hard drive and his ability to access it later) but on the fact that the image was, at one time, knowingly accessed and viewed (*see Kent*, 79 AD3d at 68; *see also State v Hurst*, 181 Ohio App 3d 454, 470, 909 NE2d 653, 664-665 [2009]; *People v Josephitis*, 394 Ill App 3d 293, 301, 914 NE2d 607, 612-613 [2009]).[4]

■ ■ Like the federal courts to address the issue, we agree that where no evidence shows defendant was aware of the presence of the cached files, such files cannot underlie a prosecution for promotion or possession. This is necessarily so because a defendant cannot knowingly acquire or possess that which he or she does not know exists (*see United States v Kuchinski*, 469 F3d 853, 863 [2006] [to prosecute a defendant who lacks knowledge about the cache for possession of files stored therein "turns abysmal ignorance into knowledge and a less than valetudinarian grasp into dominion and control"]).

However, cached images can serve as evidence of defendant's prior viewing of images that were, at one time, resident on his computer screen. Such evidence, like a pattern of browsing for child pornography, is relevant to the mens rea of both crimes by showing that a defendant did not inadvertently access an illicit image or site or was not mistaken as to its content.

■ ■ Nonetheless, that such images were simply viewed, and that defendant had the theoretical capacity to exercise control over them during the time they were resident on the screen, is not enough to constitute their procurement or possession. We

---

4. One legal commentator has described the distinction between these two approaches, deemed respectively, the "Present Possession" approach and "the Evidence Of" approach, as follows:

> "The first approach places legal significance on the images found in a cache . . . The second, alternative approach places legal significance on the images that the computer user sought out and placed on his computer screen. This approach holds that the copies of the images found in a cache constitute evidence of some prior (but no less real) knowing possession" (Ty E. Howard, *Don't Cache Out Your Case: Prosecuting Child Pornography Possession Laws Based on Images Located in Temporary Internet Files*, 19 Berkeley Tech LJ 1227, 1254, 1255 [Fall 2004]).

do not agree that "purposefully making [child pornography] appear on the computer screen—for however long the defendant elects to view the image—itself constitutes knowing control" (*Kent*, 79 AD3d at 66, quoting *Commonwealth v Diodoro*, 601 Pa 6, 18, 970 A2d 1100, 1107 [2009]). Rather, some affirmative act is required (printing, saving, downloading, etc.) to show that defendant in fact exercised dominion and control over the images that were on his screen. To hold otherwise, would extend the reach of article 263 to conduct—viewing—that our Legislature has not deemed criminal.

The federal statute regulating conduct related to child pornography, 18 USC § 2252A, provides a useful contrast. Section 2252A was amended in 2008 to provide that any person who either "knowingly possesses, *or knowingly accesses with intent to view*, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography" is subject to a fine and imprisonment (*see* 18 USC § 2252A [a] [5] [B] [emphasis added], as amended by Pub L 110-358, § 203, 122 US Stat 4002, 4004). Neither provision of the Penal Law at issue here contains comparable language targeted toward the "pull technology" by which one accesses and views Internet images. The words that are employed—"procures" and "possesses"—would not, in ordinary speech, encompass the act of viewing (*see State v Barger*, 349 Or 553, 563, 247 P3d 309, 314 [2011] ["Looking for something on the Internet is like walking into a museum to look at pictures—the pictures are where the person expected them to be, and he can look at them, but that does not in any sense give him possession of them"]).

■ ■ Here, the "School Backyard" Web page was automatically stored in the cache in allocated space that was accessible to defendant. The People did not demonstrate that defendant knew that the page, or any other, for that matter, had been cached. While the cached page provided evidence that defendant previously viewed the site, the People presented no evidence that defendant downloaded, saved, printed or otherwise manipulated or controlled the image while it was on his screen. That defendant accessed and displayed the site, without more, is not enough. Thus, the evidence was insufficient to show that defendant knowingly possessed the "School Backyard" Web page, either in the form of the cached file or as an image on his screen. It follows, therefore, that there was not sufficient evidence that defendant procured the "School Backyard" page; defendant did

not "get possession of [the page] by particular care or effort" (*Keyes*, 75 NY2d at 348 [internal quotation marks omitted]) as by downloading it. Thus, defendant's convictions under counts 1 and 142 should be reversed.

██ ██ We agree with the Appellate Division, however, that defendant was properly convicted of promotion and possession of the "Arina" video, and possession of 132 images of child pornography recovered from the unallocated space on his computer. Investigator Friedman's testimony established that at some point defendant downloaded and/or saved the video and the images, thereby committing them to the allocated space of his computer, prior to deleting them. Thus, viewing the evidence in the light most favorable to the People, a rational factfinder could conclude that defendant acquired the video and exercised control over it and the images (*see People v Contes*, 60 NY2d 620, 621 [1983]). That defendant did so knowingly was conclusively established by, among other things, copious evidence of his persistent pattern of browsing for child pornography sites; his meticulous cataloguing of thumbnail images of young, provocatively dressed girls; his deletion of illegal images and retention of legal ones; and defendant's messages to "P.B." discussing the pornographic content of the images and sites defendant perused.

Defendant also contends that County Court erred in permitting the People to amend count 2 of the indictment and that counsel provided ineffective assistance. We have considered these arguments and find them to be without merit.

Accordingly, the order of the Appellate Division should be modified by dismissing counts 1 and 142 of the indictment and remitting to County Court for resentencing and, as so modified, affirmed.

GRAFFEO, J. (concurring in result only). The majority holds that it is legal in New York to knowingly access and view child pornography on the Internet. I do not support this view and write separately to explain what I believe is the reasonable application of the relevant Penal Law provisions and the important public policies underlying their enactment. It is important to emphasize that this case deals with issues pertaining to child pornography on the Internet, not Web sites containing the sexual activities of adults. There is a fundamental reason that the law handles these two topics differently—children are legally incapable of consenting to engage in such sexual behaviors.

I

Children are among the most vulnerable citizens in our society. For whatever reason, an unfortunate aspect of the human condition causes certain adults to prey upon children for purposes of sexual gratification or financial gain in ways that subject children to serious psychological damage and, in many cases, physical abuse and related medical problems. The persons who produce and promote child pornography derive perverse satisfaction from compelling children to engage in sexually suggestive conduct or actual sexual contact with other children, adults, animals or other forms of deviant conduct that is undeniably detrimental to them, particularly for prepubescent children. Worse yet, they photograph, record or videotape these encounters for future public viewing. The availability of computer technology and the ease of digital photography has made the publication and sharing of child pornography available on a global scale previously unknown in our society. The harm inflicted on child victims, many of whom are less than 10 years of age, is well documented.[1] Granted, the case before us does not involve the production or dissemination of child pornography; rather, it addresses whether knowingly viewing child pornography on the Internet is subject to criminal penalties under the Penal Law in New York. Because I conclude that the Legislature recognized that a child is victimized each time an image of the child is knowingly viewed, I believe that this conduct falls within the reach of our statutory prohibition.

Decades ago, the New York Legislature recognized the gravity of this form of child abuse. It outlawed the "promotion" of these materials in 1977 (see L 1977, ch 910, § 2; see Penal Law § 263.15) in an effort to "eradicate child pornography" in all its forms and "thereby combat the sexual exploitation of children" (*People v Keyes*, 75 NY2d 343, 346 [1990]). The promotion statutes were obviously aimed at the producers, distributors and sellers of these products, but the word "promote" was broadly defined and this Court determined that the term also included the "acquisition" of such material for personal consumption (*id.* at 348; Penal Law § 263.00 [5]). Even though personal computers and the Internet were not widely available to the public at that time, the Legislature presciently used broad language that we eventually determined covered digital computer images (see *People v Fraser*, 96 NY2d 318, 327-328 [2001]).

---

1. *See e.g.* U.S. Dept of Justice, The National Strategy for Child Exploitation Prevention and Interdiction: A Report to Congress, at 9 (2010), available at http://www.justice.gov/psc/docs/natstrategyreport.pdf.

However, the 1977 legislation did not criminalize the possession of child pornography, apparently because there was then a lingering question whether mere possession was afforded some protection by the First Amendment. That notion was quickly dispelled as it was firmly established that child pornography could be declared illegal without offending either the federal or state constitutions (*see e.g. New York v Ferber*, 458 US 747, 764 [1982]; *Osborne v Ohio*, 495 US 103, 111 [1990]; *People v Ferber*, 57 NY2d 256, 259 [1982]).

In the absence of constitutional impediments and in light of the expanding market for child pornography that continued to flourish despite the 1977 ban on promotion, the Legislature took further action in 1996 to criminalize the possession of child pornography (*see* L 1996, ch 11, § 1). The legislation was proposed to confront the reality that "society cannot hope to eradicate this evil unless the market for these perverse materials is destroyed" (Governor's Approval Mem, Bill Jacket, L 1996, ch 11, at 9, 1996 McKinney's Session Laws of NY, at 1845). The targets of this legislation were the "consumers" of child pornography who fueled the expansion of the production of child pornography and, in many instances, made its creation highly profitable. Consistent with the expansive strategy effected for the promotion statutes in 1977, the Legislature criminalized the knowing "possession or control [of] any performance which includes sexual conduct by a child less than sixteen years of age" in Penal Law § 263.16.

## II

Although it is not necessary for our Court to address these issues to resolve this case,[2] the majority has decided to consider

---

2. If legalization of the viewing of Internet child pornography was not unfortunate enough, there is an aspect of the majority's decision that is somewhat ironic—it is not necessary for us to examine the issues raised in the majority opinion. Defendant was not charged with looking at the "School Backyard" images on the Internet. The theory of the prosecution was that he knowingly caused the images to be placed into the Internet cache (for count 1, charging promotion) and knowingly possessed them during a certain period of time that they were in the cache (for count 142, charging possession). The People introduced no proof at trial that defendant was aware of how caching worked, they conceded that it is an automatic process that most computer users are unfamiliar with, and the prosecutor told the judge that defendant did not, in fact, realize that the images were being saved in the cache. Based on those facts and the People's limited theory of the case, there is insufficient evidence that defendant knowingly procured or possessed the "School Backyard"

*(n. cont'd)*

whether the statutory bans on acquiring and possessing embrace the viewing of images of child pornography that are accessed on the Internet. The majority answers this question in the negative without engaging in an examination of the statutory text or purpose. Instead, it declares that viewing child pornography on the Internet is permissible and that "some affirmative act is required (printing, saving, downloading, etc.) to show that [the] defendant in fact exercised dominion and control over the images that were on his screen" (majority op at 303).

The result of the majority's analysis is that the purposeful viewing of child pornography on the Internet is now legal in New York. A person can view hundreds of these images, or watch hours of real-time videos of children subjected to sexual encounters, and as long as those images are not downloaded, printed or further distributed, such conduct is not proscribed. I am compelled to disagree because I believe that our Penal Law outlaws this purposeful activity.

### III

I begin, as we must, with the text of the statute. Penal Law § 263.16 is directed at two distinct types of conduct: possession or control of child pornography.[3] The word "possess" is restricted by language in another provision of the Penal Law to "tangible property" (Penal Law § 10.00 [8]). Since child pornography on the Internet is digital in format, it is intangible in nature and therefore cannot be "possessed" as that term is currently defined by the Penal Law. It goes without saying that in light of the majority's decision, the Legislature needs to revisit this definition if its intention has been to extend the scope of proscribed conduct to the intentional Internet viewing of child pornography.

---

images so I agree that counts 1 and 142 require dismissal. However, if the People's theory had been different, I may well have found that defendant's accessing and viewing of pornographic images of children, along with the thousands of suggestive photos that he catalogued and saved, and the numerous times that his computer recorded his viewings, supported an inference that defendant knowingly obtained and possessed the "School Backyard" images. With regard to the other counts, I concur that those convictions should be affirmed for the reasons stated by the majority.

3. Penal Law § 263.15 forbids the promotion of child pornography. "Promot[ion]" is defined to cover a person who "procure[s]" such material (Penal Law § 263.00 [5]). We have held that this includes the act of acquiring child pornography for personal use (see People v Keyes, 75 NY2d at 348). To "acquire" means to "get as one's own" or to "come into possession or control of" (see Merriam-Webster's Collegiate Dictionary [11th ed 2012], acquire, available at http://unabridged.merriam-webster.com/collegiate.htm).

But the breadth of the term "control" is not so limited by statutory definition. Consequently, this term should be interpreted in the manner that it is commonly understood (*see e.g. People v Quinto*, 18 NY3d 409, 417 [2012]). The usual meaning of "control" is to have power over or the ability to manage (*see e.g.* Webster's Third New International Dictionary, Unabridged [Merriam-Webster 2012], control, available at http://unabridged.merriam-webster.com; Black's Law Dictionary 378 [9th ed 2009]). The question, then, is does a person exercise power—that is, control—over child pornography when that person knowingly accesses and views such material on the Internet? In my view, this question can be answered in the affirmative.

It is certainly possible to control something that is intangible—a fact that the majority concedes in accepting that Penal Law § 263.16 applies to the saving or downloading of child pornography onto a computer hard drive. When using the Internet, a person must first decide to search for Web sites that contain child pornography and, once they are located, to choose a particular item to observe. Once the desired image appears on the screen, the user must then engage in a variety of decisions that exemplify control over the displayed depiction: continue looking at the image or delete it; decide how long to view it; once the viewing is complete, to keep the image in its own tab or browser window, or simply move on to some other image or Web page; save the image to the hard drive or some other device; or print it in a tangible format. Through this process, the viewer exercises power over the image because he manages and controls what happens to it (*see Commonwealth v Diodoro*, 601 Pa 6, 18, 970 A2d 1100, 1107 [2009] ["intentionally seeking out child pornography and purposefully making it appear on the computer screen . . . constitutes knowing control"], *cert denied* 558 US —, 130 S Ct 200 [2009]).

A few relatively common examples of control over Web pages illustrate this point. When the Internet is used to conduct online banking, such as to transfer funds between accounts, the user exercises control over the Web site displayed on the screen by, for example, authorizing the transfer. The same is true about shopping on the Internet—a person enters ordering and payment information and then approves the transaction. Even when browsing news Web sites, the user controls the images that appear on the screen by deciding whether to keep reading an article, click a hyperlink, go to another site or exit the browser altogether.

Hence, the use of the term "control" in the statute can reasonably be interpreted to cover precisely what the majority says it does not—consciously acquiring and viewing child pornography on the Internet. If the majority's concern in adopting the limited scope of "possession or control" is to prevent the prosecution of individuals who inadvertently or unintentionally access such images on their computers, then it is misplaced. I certainly share the concern—and there is no question that the Legislature did not intend that persons who view such material accidentally be prosecuted. The Legislature did not effectuate that intent through the "possession or control" requirement, nor is it necessary to adopt the majority's unduly restricted interpretation of that element to ensure that such conduct is not criminalized.

Under Penal Law § 263.16, the People must establish that defendant knowingly possessed or controlled the images, "knowing the character and content thereof." The People can prove this mens rea element through conduct such as that imported by the majority into the control element—through storage, printing, forwarding and the like. But this is not the only conduct that would support an inference that the possession or control was "knowing." That images were intentionally accessed can be inferred in any number of ways, such as evidence establishing the number of items viewed on certain occasions, the frequency with which such images were viewed, whether other images have been saved and the length of time spent browsing for child pornography. This analysis regarding the consistency and quantity of viewings will shield the inadvertent viewer of child pornography from prosecution. The more times a person accesses and views pornographic images of children, the less likely it is that the behavior was innocent or inadvertent. And, of course, the number of persons who have access to a certain computer and the availability of passwords or other personal information are also relevant inquiries. By adopting a narrow interpretation of the possession or control requirement, the majority has effectively conflated the mens rea element with the control element, resulting in a holding that explicitly legalizes the acquisition and viewing of child pornography over the Internet *even when that activity is clearly intentional*. This result is directly at odds with the relevant statutory language.

## IV

My suggested textual analysis of the "possession or control" requirement is consistent with the complementary purposes for

which the 1977 and 1996 legislation was enacted. When the promotion statutes were first created, the Legislature declared that the "public policy of the state demands the protection of children from exploitation through sexual performances" since the sale of child pornography was "abhorrent to the fabric of our society" (L 1977, ch 910, § 1). It is beyond dispute that exploitation occurs regardless of whether child pornography is in a tangible format or on line, and an image does not become any less exploitive because it is viewed on a computer. The presence of an image on the Internet arguably exacerbates the harm inflicted on the child victim given its global availability and ease of access. And with the high quality of digital photography, the identity of children subjected to this sexual abuse is more apparent and may be preserved for their entire lives.

This is why in 1996—after the advent of widespread Internet usage and the digital transformation of society—the Legislature sought to ban the purposeful possession of child pornography. "Permitting the possession of child pornography is, in fact, extending permission to the sexual exploitation of children; after all, some child was indeed exploited in the production of such materials" (Senate Introducer's Mem in Support, Bill Jacket, L 1996, ch 11, at 7, 1996 McKinney's Session Laws of NY, at 1982). Possession alone, without the conditions imposed by the majority, was seen as the scourge to be alleviated: "Someone who possesses child pornography does so at the expense of an exploited child, and society cannot hope to eradicate this evil unless the market for these perverse materials is destroyed" (Governor's Approval Mem, Bill Jacket, L 1996, ch 11, at 9, 1996 McKinney's Session Laws of NY, at 1845).

It is important to note that a person need not purchase child pornography in order to violate the statutory ban. The protection of children was the impetus for the statutes and whether or not the viewer pays for an image does not lessen the emotional and physical damage experienced by the child. I concur with the broad consensus that a child is not just exploited when he or she is photographed or filmed while engaging in sexual activity (see e.g. New York v Ferber, 458 US at 759; Osborne v Ohio, 495 US at 111; Child Pornography Prevention Act of 1996, Pub L 104-208, § 121, 110 US Stat 3009-26). That child is violated each time the image is accessed and viewed simply because he or she never consented—and could not consent—to the dissemination of that image. Irreparable harm occurs even if no money changes hands.

I part company with the majority on this critical point. The market for child pornography enlarges with the knowing viewing of these images, regardless of whether a price has been paid by the viewer and regardless of whether the image is downloaded or printed, because the more frequent the images of children engaged in sexual conduct are accessed, the more the creators produce to satisfy the growing demand, which results in more children being coerced and groomed for the sex trade (*see e.g. United States v Norris*, 159 F3d 926, 930 [5th Cir 1998]; U.S. Dept of Justice, The National Strategy for Child Exploitation Prevention and Interdiction: A Report to Congress, at 3 [2010]). And, perhaps most tragically, some children abused in this fashion become abusers themselves later in life, creating a vicious cycle of violence against children that the Internet helps to perpetuate.[4]

Furthermore, there's no question that the purveyors of child pornography are experts at marketing their products. Electronic availability provides virtually instantaneous access to a wide array of child pornography in a relatively anonymous fashion—something that is presumably far easier, quicker and safer to the consumer than searching for a person or place that sells such material in a physical format. Images of children in sexually suggestive poses are made available at no cost on the Internet in hopes of whetting the appetite of viewers to move on to paid subscription Web sites that display more graphic portrayals of children having sex. From the viewpoint of these child victims, there is no such thing as a harmless viewing of their images. In addition, the expansion of the consumer pool eventually fuels the profit-making motive behind the distribution of child pornography and causes "an explosion in the market for child pornography, leading, in turn, to increased access, creation, and distribution of these abusive images" (U.S. Dept of Justice, The National Strategy for Child Exploitation Prevention and Interdiction: A Report to Congress, at 138 [2010] [emphasis omitted]).[5] The majority's decision to allow the knowing

---

4. *See* Bentovim and Williams, Children & Adolescents: Victims Who Become Perpetrators, 4 Advances in Psychiatric Treatment 101, 102 (1998); Glasser et al., Cycle of Child Sexual Abuse: Links Between Being a Victim & Becoming a Perpetrator, 179 Brit J Psychiatry 482, 492-493 (2001).

5. As of 2010, both state and federal law enforcement officials "universally" reported "dramatic increases" in the number of pornographic images of children available on the Internet, the number of offenders and the number of child victims. They also observed "increase[s] in the sadistic and violent

*(n. cont'd)*

acquisition and viewing of child pornography will, unfortunately, lead to increased consumption of child pornography by luring new viewers who were previously dissuaded by the potential for criminal prosecution. I firmly believe that the Legislature recognized the pervasive nature of this criminal activity when it drafted the statutory text.

The facts of the case before us demonstrate why the Legislature believed that it was so important to criminalize this type of conduct. The "School Backyard" images were offered for free to viewers in order to entice Web visitors to pay to enter the site for access to additional child pornography. Although this case involves the defendant's viewing of no-fee pornographic images of children on the Internet, the majority does not—and cannot—dispute that the Legislature did not make a distinction between the intentional viewing of child pornography on the Internet that is paid for or viewed at no cost. I believe that the Legislature had ample justification for criminalizing all purposeful acquisition and consumption of child pornography irrespective of whether or not it was purchased. I therefore would hold that knowingly accessing and viewing child pornography on the Internet constitutes criminal conduct under our Penal Law.

SMITH, J. (concurring). I join Judge Ciparick's majority opinion, and add a few words to respond to Judge Graffeo's thoughtful concurrence.

I agree that the exploitation of children by child pornographers is an appalling evil; on this, I have no doubt that the Court is unanimous. I also acknowledge that, as Judge Graffeo says, Penal Law §§ 263.15 and 263.16 are designed to target the consumers of child pornography, in the hope of eliminating the market for it. Indeed, under section 263.15 as we interpreted it in *People v Keyes* (75 NY2d 343 [1990]), the punishment for consumers is severe: One who merely obtains child pornography for his personal use is guilty of "promoting" it, a class D felony.

Judge Graffeo argues, in substance, that we can best effectuate the Legislature's intention by reading the statutes expansively, to include as many "consumers" as the statutory language can reasonably be interpreted to permit. I do not agree.

conduct depicted in child pornography images and [reported] that they are encountering more young victims than before—particularly infants and toddlers" (U.S. Dept of Justice, The National Strategy for Child Exploitation Prevention and Interdiction: A Report to Congress, at 9 [2010]; *see also id.* at 11).

Under Judge Graffeo's reading, someone who does no more than click on a link for the purpose of looking at a pornographic picture for free—someone who has never interacted with a child victim, has never copied, downloaded or saved a pornographic picture of a child, and has never put a penny in the pocket of a child pornographer—is subject to up to seven years in prison for a first offense (*see* Penal Law § 70.00 [2] [d]). This is surely a stringent punishment for someone whom many would think more pathetic than evil. Nor can we safely assume that bringing as many consumers as possible within the reach of the law is the most effective way to lessen or eliminate the trade: A policy of draconian enforcement directed at the most minor and peripheral of users is perhaps no more likely to eliminate child pornography than a similar policy would be to eliminate illegal drugs.

These questions are for the Legislature to decide, of course. But we should not assume that the Legislature, where it has not plainly said so, intended to criminalize all use of child pornography to the maximum extent possible. I agree with Judge Graffeo that the statutes, as written, draw no line between consumers who pay for images and those who look at them for free (*see* concurring op of Graffeo, J., at 312); to me, however, this is a reason to be restrained, rather than aggressive, in deciding what acts have been made criminal.

Chief Judge LIPPMAN and Judges READ, SMITH and JONES concur with Judge CIPARICK; Judge GRAFFEO concurs in result in a separate opinion in which Judge PIGOTT concurs; Judge SMITH concurs in another opinion.

Order modified, etc.